**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RICHARD CARSON,

           Plaintiff,

vs.                                        CASE NO. 3:07-cv-060-J-32TEM

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

           Defendant.

_____

## <u>REPORT AND RECOMMENDATION</u>[2]

    This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

    The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25, Federal Rules of Civil Procedure, Michael J. Astrue is substituted as Defendant herein.

[2] Any party may file and serve specific, written objections hereto within TEN (10) DAYS after service of this Report and Recommendation. Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal. *See* 28 U.S.C. § 636(b)(1) and Local Rule 6.02(a), United States District Court for the Middle District of Florida.

Accordingly, the instant matter has been decided on the written record.  For the reasons set out herein, the undersigned **recommends the Commissioner's decision be AFFIRMED**.

## I. Procedural History

Plaintiff initially filed for DIB on January 2, 1996.  (Tr. 100-07).  Plaintiff claimed a disability onset date of February 28, 1995 due to a knee injury.[3]  (Tr. 100).  A hearing was held on April 17, 1997 before Administrative Law Judge ("ALJ") Linda R. Haack, at which, Plaintiff appeared and testified.  (Tr. 24-79).  On July 25, 1997, the ALJ issued an unfavorable decision and the Appeals Council subsequently denied review.  (Tr. 3, 6-17).

On February 8, 1999, Plaintiff filed a complaint in the United States District Court for the Middle District of Florida, appealing the decision of the ALJ.  (Doc. #1 at 3).  On April 20, 2000, the Honorable Howard T. Snyder, United States Magistrate Judge, remanded the case for further proceedings.  (Tr. 265-75).  Judge Snyder reversed the Commissioner's decision with instructions to reconsider Plaintiff's visual impairment,[4] and if appropriate, develop the record further.  (Tr. 275).

After remand, a supplemental hearing was held on April 24, 2001 before ALJ Haack. (Tr. 400-09).  Although Plaintiff did not testify at the supplemental hearing, he was represented by attorney N. Albert Bacharach ("Bacharach").  (Tr. 400-09).  The ALJ closed the supplemental hearing near the beginning of the proceedings because she felt

---

[3] Plaintiff met the insured status requirements for Title II benefits for the time period between February 28, 1995 and June 30, 1999.

[4] Plaintiff additionally claimed that a cataract on his eye prohibited him from working during his insured status period (February 28, 1995 through June 30, 1999).  The undersigned notes that Plaintiff does not appeal the propriety of the ALJ's additional findings regarding Plaintiff's visual impairment.

2

Bacharach was not prepared for the hearing. (Tr. 407-09). Subsequently, a second supplemental hearing was held on November 8, 2001, at which, Plaintiff testified and was represented by attorney Pam Collins ("Collins"). (Tr. 410-57).

After hearing Plaintiff's testimony, ALJ Haack closed the hearing to allow time for Collins to develop the medical record further. (Tr. 456-57). A third and final supplemental hearing was held on September 10, 2002. (Tr. 458-517). Plaintiff once again testified and was represented by Collins.

After hearing testimony at the supplemental hearings and reviewing the medical evidence of record, the ALJ determined that, although Plaintiff could not return to his past medium exertional level work, Plaintiff had transferrable job skills and retained the residual functional capacity ("RFC") to perform a significant range of light and sedentary work. (Tr. 262, Finding 12). The ALJ found Plaintiff's RFC allowed him to lift and carry up to 40 pounds, sit four hours in an eight-hour day for one to one and a half hours at a time, stand four hours in an eight-hour day for one to one and a half hours at a time, and walk three blocks at a time, so long as he avoided uneven pavement, rapid movement, crowds, dangerous equipment, and unprotected heights. (Tr. 261, Finding 7).

In a decision dated December 20, 2002, Plaintiff's disability claim was again denied by the ALJ. (Tr. 246-62). The ALJ found Plaintiff not disabled at the fifth step of the sequential evaluation process by relying upon the testimony of a vocational expert and the *Dictionary of Occupational Titles* to conclude Plaintiff could perform a number of jobs in the national and local economy, such as estimator, purchasing agent, industrial order clerk, and space scheduler. (Tr. 262, Finding 13).

On December 12, 2006, the Appeals Counsel affirmed the ALJ's December 20, 2002 decision.  (Doc. #1 at 3).  Plaintiff now seeks the Court's review of the ALJ's second unfavorable decision.  (Doc. #1).

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).

The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)[5]; *Crayton v. Callahan*, 120 F. 3d 1217, 1219 (11th Cir. 1997).  Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).  The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept

---

[5]All references made to 20 C.F.R. will be to the 2007 edition unless otherwise specified.

4

as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless

he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

### III. Background Facts

Plaintiff is an electrician by trade who claims an inability to work beginning on February 28, 1995 due to a knee injury he sustained after he fell from the last two rungs of a ladder at work.  (Tr. 100, 422).

On February 28, 1995, immediately after injuring his knee, Plaintiff went to the emergency room at Memorial Hospital in Jacksonville, Florida (Memorial Hospital).  (Tr. 139-40).  X-rays taken of Plaintiff's knee revealed a soft tissue injury and degenerative changes involving Plaintiff's patellar femoral joint.  (Tr. 137).  On April 4, 1995, a little more than one month after Plaintiff's emergency room visit, orthopedic surgeon Dr. Georges Bahri ("Dr. Bahri") performed knee surgery on Plaintiff.  (Tr. 129).

Dr. Bahri discovered that, in addition to Plaintiff's soft tissue injury (*i.e.* his torn tendon from the fall), Plaintiff suffered from chondromalacia (a degenerative disease of the cartilage) on the back of his patella, or knee cap.  (Tr. 129).  During Plaintiff's knee operation, Dr. Bahri repaired Plaintiff's injured tendon and performed a meniscetomy (excision) of the cartilage on the back of Plaintiff's knee cap.  (Tr. 129).  After Plaintiff's operation, Dr. Bahri noted that Plaintiff tolerated his knee surgery well and was in stable condition.  (Tr. 130).

6

On October 9, 1995, approximately six months after his knee surgery, Plaintiff was seen by an examining orthopedist, Dr. Chaim Rogozinski ("Dr. Rogozinski"), regarding his state worker's compensation claim.   (Tr. 141).   Dr. Rogozinski noted that Plaintiff underwent three months of physical therapy and that Plaintiff stated he continued to experience pain in his right knee, which ranged from zero to four on a scale of ten.  (Tr. 142).  Dr. Rogozinski further noted that Plaintiff stated he did not experience any pain in his knee while at rest, and that Plaintiff's "biggest concern about his knee is [a] popping sensation that he feels." (Tr. 142).  After performing a physical examination of Plaintiff, Dr. Rogozinski's overall impression was as follows:

> I believe the patient [Plaintiff] presently is at MMI [maximum medical improvement] and has suffered a 15% whole body impairment....  This impairment relates 18% of the lower extremity for loss of motion, 20% of the lower extremity for medial and lateral partial meniscectomies. [...] I believe that the patient can be returned back to work.  He is to avoid unprotected heights, ladder climbing, but has no weight restriction.  Because of the hypertrophy [increased bulk] of the involved leg, I do believe he has maximized on rehabilitation and no further rehabilitation is needed.

(Tr. 143).

On April 23, 1996, approximately one year after his knee operation, Plaintiff was examined by a medical disability examiner, Dr. C. V. Lazo ("Dr. Lazo").  (Tr. 148-53).  Dr. Lazo tested Plaintiff's range of motion in his right knee, which was limited to 90 degrees out of a possible 150 degrees.  (Tr. 153).  Dr. Lazo noted that Plaintiff stated he experienced pain with sudden movement, experienced stiffness in his knee after driving four hours without stopping to stretch, used ice and Aleve (a non-prescription anti-inflammatory) to abate pain, and "spends his time exercising and strengthening [his] knee 3 days per week at the local health spa."  (Tr. 148).

On May 16, 1996, a state agency medical consultant completed Plaintiff's residual physical functional capacity assessment and determined Plaintiff could stand and/or walk (with normal breaks) for a total of six hours in an eight-hour day and sit (with normal breaks) for a total of six hours in an eight-hour day. (Tr. 155). The state agency medical consultant also determined that Plaintiff could occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 156).

On August 2, 1996, another state agency medical consultant completed a second residual physical functional capacity assessment and determined Plaintiff could stand and/or walk (with normal breaks) for a total of six hours in an eight-hour day and sit (with normal breaks) for a total of six hours in an eight-hour day. (Tr. 163). The state agency medical consultant also determined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 164).

From 1996 through 2002, Plaintiff was seen by a number of treating physicians at Shands of Jacksonville, f/k/a University Medical Center ("UMC"), for a variety of ailments including chest pain, sore throat, personality disorder, cataracts, and knee pain. (*See* Tr. 170-84, 191-229, 296-316, 378-86). On January 30, 2001, one of Plaintiff's treating physicians at UMC, Dr. John McCaulie ("Dr. McCaulie") (who primarily saw Plaintiff for chest pain),[6] filled out a Residual Functional Capacity ("RFC") evaluation form regarding Plaintiff's claim for disability benefits for the time period between October 11,1996 and June

---

[6] *See* Tr. 287-301, 303, 362-64.

30, 1999.[7]  (Tr. 324-32).

In the aforementioned evaluation form, Dr. McCaulie stated that, during the time period in question, Plaintiff could only work for a total of one hour per day if the job involved mostly sitting or mostly standing, and that Plaintiff could only work for a total of two hours per day if the job had a sit/stand option.  (Tr. 324-26).  Dr. McCaulie stated that he based his findings on orthopedic notes and x-rays of Plaintiff's right knee contained within Plaintiff's file.  (Tr. 327).

Additionally, Dr. McCaulie stated that during his course of treatment Plaintiff repeatedly reported experiencing pain and that based on his experience a person with Plaintiff's diagnosis would be expected to experience pain.  (Tr. 328).  Dr. McCaulie noted Plaintiff reported to him marked pain at a level of six or seven on a scale of ten, which Plaintiff stated interfered with his concentration and activities of daily living. (Tr. 331). Lastly, Dr. McCaulie rated Plaintiff's pain at a level of six or seven on a scale of ten and stated that he believed Plaintiff's pain interfered with Plaintiff's concentration and activities of daily living.  (Tr. 331).

During Plaintiff's initial hearing in 1997, Plaintiff testified that he drove 30 to 40 miles per week and that during a typical week he would go to the post office, grocery store, mall, and health club.  (Tr. 33).  Plaintiff further testified that on occasion he drove to Atlanta, Georgia, which would take him approximately six hours.  (Tr. 49).  Plaintiff stated that in order to complete the drive to Atlanta he had to stop every "couple of hours" to stretch his

---

[7] The undersigned notes that Bacharach, Plaintiff's attorney, sent Dr. McCaulie the evaluation form to fill out and that the beginning date Dr. McCaulie was instructed to refer to concerning Plaintiff's injuries is different than the beginning date of Plaintiff's insured status time period at issue (February 28, 1995 through June 30, 1999).

knee.  (Tr. 52).

When the ALJ asked Plaintiff what activities he did before his knee injury that he could not do anymore, Plaintiff responded that he could not go to the movies or the flea market "because of the crowds of people."  (Tr. 52).  When the ALJ asked Plaintiff what it was about the crowds of people that prevented him from going to the movies or the flea market, Plaintiff responded that people "don't respect a person that's on crutches, or on a walking stick.  They bump into you, knock you down, step in front of you, make you stop."[8] (Tr. 53).

At the November 8, 2001 supplemental hearing, Plaintiff testified that during his insured status period at issue he could understand and follow instructions and that he could keep his mind on what he was doing.  (Tr. 446).  Furthermore, Plaintiff testified that on an average day his pain was a level six on a scale of ten, but after he took Aleve his pain would drop to a level three on a scale of ten.  (Tr. 450).  Plaintiff also stated that "maybe once" per day he would lie down and prop his leg up on his bed in order to alleviate his knee pain.  (Tr. 451-52).

At the September 10, 2002 supplemental hearing, Plaintiff testified concerning his work experience as an electrician.  (Tr. 479-89).   Plaintiff stated he obtained his

---

[8] Although Plaintiff testified that sometime in 1996 he was provided a cane by his physical therapist, Mike Ward ("Ward"), in order to assist him in ascending stairs or in case he needed help if he was to be out of his house for long periods of time (Tr. 428), Ward stated in an October 14, 1996 letter to a fitness consultant that Plaintiff's right knee was "stable enough to exercise." (Tr. 196).  Additionally, at his April 17, 1997 hearing, Plaintiff testified to walking on a treadmill at an average pace for a distance of 1.2 miles three times per week.  (Tr. 42, 46, 428).  Moreover, at his November 8, 2001 hearing, Plaintiff stated that he stopped using the cane in the early part of 1996 through1998 because he was "able to walk on it [his leg] better" and that he currently wore an aluminum knee brace.  (Tr. 428).  The Court notes that the ALJ asked the testifying vocational expert if wearing a knee brace on either or both knees would change the vocational expert's answer to the question posed concerning Plaintiff's RFC and Plaintiff's ability to perform other jobs in the economy, to which, the vocational expert testified it would not.  (Tr. 500).

10

journeyman's licence in Texas and that since then he has worked for many different companies in various capacities, such as supervisor (journeyman), and electrician's helper. (Tr. 479-91).  Vocational Expert Paul Dolan ("VE Dolan") testified that Plaintiff's past work as an electrician's apprentice, electrician's helper, and journeyman are all classified as medium exertional level work, which range from semi-skilled to skilled in accordance with the *Dictionary of Occupational Titles* ("DOT").  (Tr. 489-492).

VE Dolan further testified that Plaintiff has transferrable skills, such as a knowledge of tools, materials, machines, and methods used in the industry, and that Plaintiff has the skills to read and understand blueprints and scaled drawings. (Tr. 492-93).  In addition, VE Dolan stated that given Plaintiff's transferrable skills a significant number of other jobs exist in the local and national economy that Plaintiff can perform despite his limitations.  (Tr. 495-9).  Specifically, VE Dolan stated that Plaintiff can perform the jobs of estimator, purchasing agent, industrial order clerk, and space scheduler as defined in the DOT.  (Tr. 495); *see* 1 United States Dep't of Labor, *Dictionary of Occupational Titles* §§ 169.267-038, 162.157-038, 221.367-022, 238.367-022 (4th Ed. 1991).

The ALJ, asked VE Dolan to consider whether a hypothetical individual with Plaintiff's RFC could perform the aforementioned jobs, to which, the VE answered in the affirmative. (Tr. 499).  The ALJ's hypothetical individual included, among other limitations, a limitation on sitting and standing for a total of four hours each out of an eight-hour workday, alternating between the two positions approximately every one to one and a half hours.  (Tr. 497-501).

The ALJ relied on the testimony of VE Dolan and determined at Step 5 of the sequential evaluation process that Plaintiff was not disabled because there were significant

jobs in the local and national economy that Plaintiff could perform despite his limitations.

## IV. Analysis

### A. Whether the ALJ Properly Discounted the Opinion of Plaintiff's Treating Physician

Plaintiff's first argument is that the ALJ "unreasonably" discounted the opinion of his treating physician, Dr. McCaulie, who stated Plaintiff could only sit or stand for a total of two hours out of an eight-hour workday during the time period in question.  (Doc. 15 at 10; Tr. 324-32).[9]  The undersigned, however, finds this argument unpersuasive because the ALJ articulated several reasons for discounting Dr. McCaulie's opinion concerning Plaintiff's workplace limitations.[10]  Moreover, as discussed below, the undersigned finds the ALJ's reasons for discounting Plaintiff's treating physician's opinion are supported by substantial evidence of record.[11]

Plaintiff correctly notes that controlling weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards,* 937

---

[9] The undersigned notes that, although Plaintiff argues Dr. McCaulie is not the doctor referenced by the ALJ in Exhibit 41, pp. 13 and 14 (Doc. #15 at 12), Dr. McCaulie's name is stamped onto the pages of those exhibits as the attending physician.  (*See* Tr 363-64, Exhibit 41, pp. 13 and 14).

[10] The ALJ misquoted the record by stating Plaintiff only sought treatment from Dr. McCaulie twice and by stating there is no evidence Plaintiff sought treatment from Dr. McCaulie during his insured status period.  (Tr. 254).  The undersigned notes that Plaintiff sought treatment from Dr. McCaulie for a total of twelve times and that, on two occasions, Plaintiff sought treatment from Dr. McCaulie (for chest pain) during his insured status period.  (Tr. 287-303, 362-64).  Although the ALJ misquoted the record as it relates to the number of times Plaintiff sought treatment from Dr. McCaulie, the undersigned finds this error is harmless in light of the fact substantial evidence supports the ALJ's other articulated reasons for discounting Dr. McCaulie's opinion.

[11] Although the ALJ commented that she questioned whether Dr. McCaulie was a treating source, as defined by the Social Security Regulations, since he only saw Plaintiff on two occasions, the ALJ nevertheless proceeded to discount Dr. McCaulie's opinion as if he were a treating source.  Additionally, the undersigned finds, as a matter of law, Dr. McCaulie was a treating physician as defined by the Social Security Regulations.  *See* 20 C.F.R. § 404.1502.

F.2d at 583.  If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in the record*, the ALJ must give the treating physician's medical opinion controlling weight.  20 C.F.R. § 404.1527(d)(2) (*emphasis added*).  The ALJ, however, may discount a treating physician's opinion regarding a plaintiff's inability to work if the opinion is not supported by the evidence of record or is wholly conclusory.  *See Edwards*, 937 F.2d at 583.

In the instant case, the ALJ discounted Dr. McCaulie's opinion that Plaintiff can only sit or stand for a total of two hours out of an eight-hour workday by pointing out multiple inconsistencies within the record as a whole.  (Tr. 254-55).

First, the ALJ notes that the degree of pain identified by Dr. McCaulie (*i.e.* marked pain which interfered with Plaintiff's concentration and activities of daily living) is inconsistent with Plaintiff's own statements concerning his level of pain, which he claimed to be a level six on an average day, but which was reduced to a level three shortly after taking Aleve. (Tr. 254; *see also* Tr. 450).  Moreover, the undersigned finds Dr. McCaulie's statement that Plaintiff's pain interfered with his ability to concentrate is also inconsistent with Plaintiff's testimony that he frequently did puzzles and that he could follow instructions and concentrate without any problems during his insured status period. (*See* Tr. 446, 454).

Second, the ALJ points out that Dr. McCaulie's opinion about the extent of Plaintiff's pain is inconsistent with the fact that Plaintiff was not taking prescription pain medication

when he applied for disability in January 1996.[12]  (Tr. 254; *see also* Tr. 101).  Third, the ALJ

notes that Dr. McCaulie's statement that Plaintiff's pain prevented him from doing daily

activities is inconsistent with Plaintiff's testimony about his activities of daily living.  (Tr. 254;

*see also* Tr. 331).   Specifically, the ALJ points out that Dr. McCaulie's statement is

contradicted by Plaintiff's testimony that, despite his knee pain, he continued to drive

(sometimes from Jacksonville, Florida to Atlanta, Georgia), cook, shop, visit with people,

and exercise at the health spa three times per week.  (Tr. 255; *see also* Tr. 33, 49, 141).

Fourth, the ALJ points out that Dr. McCaulie's opinion was inconsistent with the

opinions of two state agency medical consultants, both of whom stated Plaintiff could stand

and/or walk (with normal breaks) for a total of six hours in an eight-hour day and sit (with

normal breaks) for a total of six hours in an eight-hour day.  (Tr. 155, 163).  Fifth, the ALJ

mentions that Dr. McCaulie's opinion concerning Plaintiff's limitations were inconsistent with

a consulting source, Dr. Lazo, who examined Plaintiff on April 23, 1996.   (Tr. 255).

Specifically, Dr. Lazo stated Plaintiff's knee was stable and that the only medication he took

for pain was Aleve.[13]  Additionally, the ALJ states that Plaintiff's knee stability, as noted by

Dr. Lazo, is consistent with other treatment records, such as the UMC's progress notes,

dated March 18, 1997, which mention knee stability.  (Tr. 192, 255).

---

[12] The undersigned notes that, immediately after his knee injury in 1995, Plaintiff was prescribed pain medication by the doctors at Memorial Hospital (Tr. 139) and, presumably, immediately after his operation in 1995; however, by the time Plaintiff filed his application for DIB in 1996 he was no longer taking any prescription pain medication for his knee.  (Tr. 100-07).

[13] The undersigned notes that Dr. Lazo qualified his statement in regards to Plaintiff's knee stability by stating Plaintiff's knee was stable with significant pain upon examination.  (Tr. 150).  Dr. Lazo, however, assigned no limitations to Plaintiff based on Plaintiff's knee pain.  (Tr. 148-53).  Furthermore, Plaintiff testified that taking Aleve reduced his pain level by half.  (Tr. 450).  Although Dr. Lazo stated that Plaintiff experienced significant pain upon examination, the undersigned finds the evidence of record as a whole does not support Plaintiff's contention that his knee pain precluded him from all work activity.

The sixth and final reason the ALJ gave for discounting Dr. McCaulie's opinion that Plaintiff's knee pain and instability prevent him from working more than two hours per day is that examining orthopaedist Dr. Rogozinski's stated in October 1995 that Plaintiff had reached maximum medical improvement and that he was able to return to work so long as he avoided unprotected heights and ladder climbing.  (Tr. 255; *see also* Tr. 141-43).

The United States Court of Appeals for the Eleventh Circuit has concluded "good cause" exists to discount a treating physician's opinion when: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or, (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004).

Here, the undersigned finds that the ALJ was entitled to discount Dr. McCaulie's opinion that Plaintiff was unable to sit or stand for more than two hours out of an eight-hour workday during Plaintiff's insured status period because his opinion was not supported by the evidence of record as a whole.  Accordingly, the undersigned finds the ALJ properly weighed the opinion of Plaintiff's treating physician, Dr. McCaulie, and applied the proper legal standards when she decided not to give Dr. McCaulie's opinion controlling weight.

**B. Whether Substantial Evidence Establishes Plaintiff Cannot Work for Eight Hours**

Plaintiff's second argument is that substantial evidence establishes Plaintiff cannot work for eight hours per day. (Doc. #15 at 13).  In support of this argument, Plaintiff relies on Dr. McCaulie's opinion that Plaintiff can only sit or stand at will for a total of two hours per day, five days per week.  (Doc. #15 at 14).

The undersigned, however, is not persuaded by Plaintiff's argument that substantial evidence establishes Plaintiff cannot work for eight hours per day. As discussed *supra*, the undersigned finds Dr. McCaulie's opinion concerning Plaintiff's limitations is not supported by substantial evidence of record and that his opinion was properly not accorded controlling weight by the ALJ. Moreover, the ALJ assigned Plaintiff a RFC which would allow Plaintiff to work at a job that had a sit/stand option, so long as the job allowed Plaintiff to alternate positions at least every one to one and a half hours. (Tr. 261, Finding 7). The undersigned finds Plaintiff's RFC is consistent with the medical evidence of record.

Additionally, the ALJ heard testimony from a vocational expert who testified that Plaintiff had transferrable skills from his job as an electrician. (Tr. 492-99). The vocational expert testified that Plaintiff's transferable skills would enable him to work at jobs which range from sedentary to light exertional levels, and that these jobs would allow Plaintiff to alternate between sitting and standing as needed. (Tr. 497-501).

Specifically, the vocational expert stated that Plaintiff can perform the jobs of estimator, purchasing agent, industrial order clerk, and space scheduler, as defined in the DOT. (Tr. 495); *see Dictionary of Occupational Titles* §§ 169.267-038, 162.157-038, 221.367-022, 238.367-022 (4th Ed. 1991). The ALJ, asked the vocational expert to consider whether a hypothetical individual with Plaintiff's RFC could perform the aforementioned jobs, to which, the VE answered in the affirmative. (Tr. 499). The ALJ's hypothetical individual included, among other limitations, a limitation on sitting and standing for a total of four hours each out of an eight-hour workday, alternating between the two positions approximately every one to one and a half hours. (Tr. 497-501). The vocational expert stated that Plaintiff could do all of the aforementioned jobs with the limitations that

16

the ALJ assessed.  (Tr. 499).

Accordingly, the undersigned does not find substantial evidence supports Plaintiff's contention that he cannot work eight hours per day.  The ALJ committed no error in finding the limitation Dr. McCaulie placed upon Plaintiff's ability to work eight hours per day was inconsistent with the other substantial evidence of record.

### IV. Recommendation

Review of the record as a whole reveals substantial evidence supports the ALJ's finding of non-disability.  Accordingly, and for the reasons stated herein, the undersigned **recommends the Commissioner's decision be AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

**DONE AND ENTERED** at Jacksonville, Florida this  26th  day of February, 2008.

Copies to:
Counsel of Record

THOMAS E. MORRIS
United States Magistrate Judge

17